# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |  |
|---|---|---|---|
| AHMED JUDGE, | : | | |
| | : | | |
| | : | Civil Action No. | 13-2896 (JEI) |
| Petitioner, | : | | |
| | : | | |
| v. | : | **OPINION** | |
| | : | | |
| UNITED STATES OF AMERICA, | : | | |
| | : | | |
| Respondent. | : | | |
| | : | | |

**IRENAS**, Senior District Judge:

Presently before the Court is the amended motion of Ahmed Judge ("Petitioner") to vacate, set aside, or correct his April 2009 conviction, brought pursuant to 28 U.S.C. § 2255. (ECF No. 8). Petitioner filed his initial motion to vacate on or about May 6, 2013. (ECF No. 1). On May 15, 2013, Petitioner filed a motion to amend his motion to add several new claims. (ECF No. 6). This Court issued a *Miller* notice on May 30, 2013. (ECF No. 7). Petitioner thereafter filed his amended motion on August 29, 2013. (ECF No. 8). Respondent, United States of America ("Respondent" or "the Government"), thereafter filed a Response on July 31, 2014. (ECF No. 15, 18), to which Petitioner replied on or about January 30, 2015. (ECF No. 23, 25). Also before the Court is Petitioner's motion to file his reply brief *nunc pro tunc* and to exceed the page limit in that brief. (ECF No. 24). As this Court has considered Petitioner's reply brief in reaching its decision, and Respondents have not opposed the motion to file *nunc pro tunc*, this Court grants Petitioner's motion to file his reply *nunc pro tunc* and to exceed the page limit for such a reply. For the following reasons, however, the Court will deny Petitioner's § 2255 motion and deny Petitioner a certificate of appealability.

## I.  BACKGROUND

The Court of Appeals, in its opinion in *United States v. Judge*, 447 F. App'x 409 (2011),

*cert. denied*, 132 S. Ct. 2376 (2012), provided the following summary of the relevant background

facts underlying Petitioner's conviction:

> Raymond Morales, who served as one of the government's key cooperating witnesses in this case, was the leader of a large-scale drug-trafficking organization based in Camden, New Jersey. Between 1993 and 2004, Morales's organization sold hundreds of kilograms of cocaine and cocaine base.  Morales distributed both through "drug sets," areas known for drug sales he operated in Camden, and through sub-organizations headed by individuals with whom Morales was friendly.  One such sub-organization was led by Jevon Lewis.  During the early 1990s through 1995, and from early 2001 through September 2002, Lewis bought cocaine in bulk from Morales.  Lewis sold at his own "drug sets" in Camden, including one at 8th and Central Streets.  Ahmed judge worked for Lewis for a period of time in 2001 and 2002, functioning primarily as an armed body-man or "enforcer" at Lewis's sets.  Mack Jones headed a second subgroup that sourced from Morales. . . . Troy Clark ran a third group that sourced through Morales, the "MOB Boys."

> On September 8, 2001, an individual was shot and killed at Morales's drug set at Atlantic and Norris Streets.  Morales believed violence at his markets was bad for business, and wanted to retaliate. Morales mistakenly believed the perpetrator was Kenneth Fussell, and offered Jevon Lewis $10,000 to have Fussell killed.  Lewis accepted and contracted with [Petitioner] and Jamar Bacon to carry out the murder.  At 11:30 p.m. on October 4, 2001, [Petitioner] and Bacon shot and killed Fussell on the front steps of Fussell's apartment in Camden.

> Camden police officer Sergeant Strang was two blocks away from the shooting when it occurred and went to the scene immediately.  An eyewitness told Strang he saw, from his second story bathroom, an African-American male wearing a sweatshirt and a baseball cap flee to a nearby field.  Strang searched the field and within minutes, found [Petitioner] hiding behind hay bales,

squatting on a sweatshirt and a baseball cap.   Strang asked [Petitioner] to show his hands and when [Petitioner] did not respond, Strang directed another officer to handcuff him.   [Petitioner] told Strang he had been shot.   When Strang asked by whom, [Petitioner] did not respond.   Strang asked if the clothes [Petitioner] was sitting upon belonged to him, and [Petitioner] answered affirmatively.

Hours later, at approximately 4:00 a.m. on October 5th, [Petitioner] was given *Miranda* warnings at the Camden police station, which he waived, and was questioned by Officer Kellejan. [Petitioner] made exculpatory statements.[1]   On November 3, 2001, [Petitioner] was arrested for the Fussell murder and brought to the Camden police station.   He was again issued *Miranda* warnings, which he waived, and was again questioned by Officer Kellejan.   [Petitioner] reaffirmed his statements from his session . . . on October 5th.

A grand jury returned a four-count indictment against [Petitioner], Jevon Lewis, and Mack Jones.   Count one charged defendants with conspiracy to distribute and to possess with intent to distribute cocaine and cocaine base, under 21 U.S.C. § 846 (conspiracy) and § 841(b)(1)(A) (drug trafficking);[2] Count Two

---

[1] The Third Circuit summarized the information contained in those statements as follows:

> In his October 5th session with Officer Kellejan, [Petitioner] admitted to being in the neighborhood at the time of the shooting. He said while on Chelton Street, individuals in a vehicle began to shoot at him, and he ran away.   [Petitioner] was unable to describe the individuals who shot him, nor could he think of any reason people would want to shoot him.   When Officer Kellejan asked [Petitioner] to point out where he was shot, [Petitioner] said he was not sure he had been wounded that evening.   Rather, he showed Officer Kellejan a scar on his ankle which he said he received four weeks earlier.   [Petitioner] denied having any involvement in the shooting of Kenneth Fussell and denied having a gun that evening. He admitted the hoodie and baseball cap found at the scene were his.   In his session on November 3, 2001, [Petitioner] reiterated his statements from the previous interview about the events of October 4, 2001.

*Judge*, 447 F. App'x at 415 n. 11.

[2] The indictment also charged Dennis Rodriguez, Francisco Morales, Ruben Lozada, and Mark

> charged [Petitioner] and Lewis with murder in furtherance of a
> continuing criminal enterprise or a drug-trafficking conspiracy,
> under 21 U.S.C. § 848(e)(1)(A); Count three charged [Petitioner]
> and Lewis with murder in the course of a firearms offense, under 18
> U.S.C. § 924(c) and Count Four charged [Petitioner] with
> possession of a firearm by a convicted felon, under 18 U.S.C. §
> 922(g).   After a two-month trial, the jury found the defendants
> guilty on all counts.

*Judge*, 447 F. App'x at 411-12.

This Court thereafter sentenced Petitioner to concurrent life sentences on counts one and

two, a one hundred and twenty month sentence on count four to run concurrent with counts one

and two, and a consecutive one hundred and twenty month sentence on count three.   (Document

2 attached to ECF No. 15).   Petitioner appealed his conviction and sentence.   The Third Circuit

affirmed on October 11, 2011.   *Judge*, 447 F. App'x at 409.   Petitioner thereafter filed the instant

§ 2255 motion.

## II.  DISCUSSION

## A.  Legal Standard

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging

the validity of his or her sentence.   Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws of
> the United States, or that the court was without jurisdiction to
> impose such a sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to collateral
> attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

---

Davis, all of whom pled guilty, as parts of the same conspiracy.  *Judge*, 447 F. App'x at 412 n.
4.

28 U.S.C. § 2255.   Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure."   *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied* 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

## B.   Analysis

### 1.   An evidentiary hearing is not required

Under § 2255, a motion to vacate requires an evidentiary hearing "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."   28 U.S.C. § 2255(b); *United States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992).   Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate that petitioner is not entitled to relief as a matter of law, no hearing is required.   *Government of Virgin Islands v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546 (evidentiary hearing is necessary only where the petitioner's claims are not conclusively resolved by the record). For the reasons set out below, Petitioner's claims are without merit, and therefore the record establishes that Petitioner is not entitled to relief as a matter of law.   As such, no evidentiary hearing is required on Petitioner's § 2255 motion.

5

**2.  Petitioner's ineffective assistance of counsel claims**

In his motion, Petitioner raises numerous arguments in support of his claim that trial counsel was constitutionally ineffective.  Claims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable."  *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'"  *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).  A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances.  *Id.*  The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel.  *Id.*  In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, he must

6

still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

**a.   Petitioner's argument that counsel was ineffective in not objecting to Petitioner's sentence**

Petitioner first argues that his counsel was ineffective in that counsel failed to object to the Court's sentencing of Petitioner on counts two, three, and four of the indictment. Petitioner's argument, essentially, is that he is being punished multiple times for a single criminal event: the killing of Kenneth Fussell. Count two of the indictment charged Petitioner with murder in furtherance of either a continuing criminal enterprise or drug trafficking conspiracy in violation of

21 U.S.C. § 848(e)(1)(A), count three with murder using a firearm during a drug trafficking offense in violation of 18 U.S.C. §§ 924(c)(1) and 924(j), and count four with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).   Petitioner argues that receiving a punishment for all three offenses violates the Double Jeopardy Clause of the United States Constitution, and counsel was therefore ineffective in failing to object to this Court's sentence.   The Government has also raised, and Petitioner in his reply adopted, the argument that count one, charging Petitioner with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 846, is a lesser included offense of count two, and that receiving a sentence as to both counts one and two violates the Double Jeopardy Clause.

The Double Jeopardy Clause of the United States Constitution "provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'"   *United States v. Dixon*, 509 U.S. 688, 695-96 (1993) (quoting U.S. Const. amend. V).   The clause protects individuals from both successive punishments and successive prosecutions for the same criminal offense.   *Id.* at 696.   Although Courts generally turn to the test provided by *Blockburger v. United States*, 284 U.S. 299 (1932), to evaluate claims that a petitioner has been twice sentenced for the same offense, that test "is not controlling when the legislative intent is clear from the face of the statute or the legislative history."   *United States v. Costa*, 553 F. App'x 227, 234 (3d Cir. 2014) (quoting *Garrett v. United States*, 471 U.S. 773, 779 (1985)).   "Because 'the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended[,] . . . a Double Jeopardy challenge must fail if the statutory text clearly reflects a legislative intent to impose multiple sentences on a defendant for a single underlying transaction.   *Id.* (quoting *United States v. Berrios*, 676 F.3d 118, 138 (3d Cir.

2012).   "If, after inspection, Congress's intent remains unclear, cumulative sentencing poses no double jeopardy problem only if 'each provision requires proof of a fact which the other does not,' thereby satisfying *Blockburger*."   *Berrios*, 676 F.3d at 138 (quoting *Blockburger*, 284 U.S. 304). As the *Blockburger* test is merely a means of discerning congressional intent, it does not control where there is a clear contrary indication of legislative intent.   *Id.* at 138-39.

"Under the concurrent sentence doctrine, a court has 'discretion to avoid resolution of legal issues affecting less than all counts in an indictment if at least one will survive and sentences on all counts are concurrent.'"   *Parkin v. United States*, 565 F. App'x 149, 152 (3d Cir. 2014) (quoting *United States v. McKie*, 112 F.3d 626, 628 n. 4 (3d Cir. 1997)); *see also United States v. Am. Investors of Pittsburgh, Inc.*, 879 F.2d 1087, 1100 (3d Cir. 1989).   The concurrent sentence doctrine, however, is inapplicable where the challenged conviction at issue "carries continued collateral consequences."   *Id.* (citing *Spencer v. Kemna*, 523 U.S. 1, 8-12 (1998); *Kendrick v. Dist. Attorney of Cnty. of Philadelphia*, 488 F.3d 217, 220 (3d Cir. 2007).   Unlike on direct review, as habeas relief is available only to challenge custody, and not the imposition of fines or special assessments, that a separate fine or special assessment was imposed does not qualify as a continued collateral consequence sufficient to defeat application of the concurrent sentence doctrine in the § 2255 context.   *See Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012); *Ridley v. Smith*, 179 F. App'x 109, 110-11 (3d Cir. 2006) ("§ 2255's language clearly and unambiguously limits its applicability to defendants seeking release from custody . . . [i]t is not available to those . . . who challenge only fines or restitution orders"); *cf. Ray v. United States*, 481 U.S. 736 (1987) (special assessments sufficient to make sentences not concurrent on direct review).   Thus the concurrent sentence doctrine is still applicable under § 2255 where the only consequence that is not concurrent

9

to both sentences is a special assessment.  *Ryan*, 688 F.3d at 849; *Parkin*, 565 F. App'x at 152 (upholding application of the concurrent sentence doctrine).

Here, Petitioner was sentenced to concurrent life sentences on counts one and two, one hundred and twenty months' imprisonment for count four to be served concurrently with the life sentences on counts one and two, and a term of one hundred and twenty months on count three to run consecutive to the other sentences.  (Document 2 attached to ECF No. 15 at 2).  Even assuming *arguendo* that count one is a lesser included offense of count two, and it would be improper to impose a sentence on both count four and count two simultaneously, this Court need not address any such argument as Petitioner received sentences on counts one and four which ran concurrently with the natural life sentence on count two which would remain.  As Petitioner would still be subject to a life sentence on count two even given those assumptions, the concurrent sentence doctrine applies, and this Court need not consider Petitioner's arguments as to the alleged double jeopardy concerns arising from the imposition of concurrent sentences on counts one, two, and four.  *Parkin*, 565 F. App'x at 152.

The only remaining claim as to Petitioner's sentence, then, is his claim that the sentence on count three was multiplicious of the concurrent sentence rendered on the remaining counts, and that counsel was therefore ineffective for failing to challenge that sentence.   Petitioner's argument as to count three is without merit, however.   The clear and unambiguous text of 18 U.S.C. § 924(c) clearly establishes that Congress intended punishment under § 924(c) and § 924(j) to be subject to separate punishment in addition to any punishment imposed on the underlying crime.  *See* 18 U.S.C. § 924(c)(1)(A) ("any person who [violates § 924] shall, in addition to the punishment provided for [the underlying] crime of violence or drug trafficking crime . . . be sentenced [under

§ 924]"); § 924(c)(1)(D)(ii) ("no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking during which the firearm was used, carried, or possessed"). Congress clearly intended criminals to receive an additional punishment for violations of § 924 over and above that received for the underlying criminal conduct, and that such punishment should run consecutively to the sentence for the underlying crime. As Congress's intent is clear and dispositive of Petitioner's double jeopardy claims as to count three, this Court need not refer to the *Blockburger* test. Because Petitioner is not entitled to habeas relief as to the sentences on counts one, two, and four pursuant to the concurrent sentence doctrine, and because the plain text of § 924 clearly establishes a congressional intent to impose an additional sentence, Petitioner has failed to show that he has a viable double jeopardy claim, and as such has failed to show that he is entitled to relief under § 2255 on this claim as counsel was not deficient in failing to challenge the additional sentence imposed on count three.

**b. Petitioner's argument that counsel was ineffective for failing to call certain witnesses at trial**

Petitioner next argues that counsel was ineffective in that he did not call certain witnesses at trial, did call Ruben Lozada, and as a result of these decisions failed "to put on a reasonable defense."[3] In his amended petition, Petitioner specifically challenges counsel's decisions not to

---

[3] The Court considers in this section both Petitioner's points two and six. In his reply brief, Petitioner made clear that his argument as to failure to put on a defense was based on his assertions as to Lozada and counsel's "failure" to call the other witnesses discussed here. As

call Dr. Bogacki, a psychologist who interviewed Petitioner prior to trial, and one of his co-defendants, Jevon Lewis, and counsel's decision to call Lozada as a witness following only a brief interview.   In his reply brief, Petitioner attempts to add a claim that counsel was also ineffective for failing to call two additional witnesses, one of whom allegedly saw Petitioner on the night of the shooting.

As to the two witnesses whose purported testimony was first raised in Petitioner's reply brief, this Court notes that a "moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief."   *D'Allessandro v. Bugler Tobacco Co.*, Civil Action No. , 2007 WL 130798, at *2 (D.N.J. Jan. 12, 2007) (quoting *Int'l Raw Materials, Ltd. V. Stauffer Chem. Co.*, 978 F.2d 1318, 1327 n. 11 (3d Cir. 1992)).    This doctrine extends to the habeas context as "[b]asic fairness requires that an opposing party have a fair notice of his adversary's claims, as well as an opportunity to address those claims."   *Soto v. United States*, Civil Action No. 04-2108, 2005 WL 3078177, at *6 (D.N.J. Nov. 16, 2005); *see also Thompson v. United States*, Civil Action No. 12-1312, 2015 WL 1344793, at *6 n. 9 (D.N.J. Mar. 23, 2015).   The prohibition against raising new facts and arguments in reply is especially applicable where, as here, a Petitioner was provided a *Miller* notice advising him that all claims must be presented in one § 2255 motion and Petitioner responded to that notice by the filing of an amended petition in which Petitioner could easily have raised the points he now seeks to raise in reply.   *See, e.g., Rodriguez v. United States*, Civil Action No. 04-158, 2005 WL 2007033, at *9 n. 7 (D.N.J. Aug. 22, 2005).   This Court therefore need not, and will not, consider Petitioner's

---

such, these two claims both concern counsel's decision to call or not call certain witnesses, and this Court will therefore discuss those two claims together.

arguments regarding counsel's failure to call Tralanna Redd or Shanel Nelson as Petitioner was provided ample opportunity to include those claims in his amended motion, but chose not to do so, instead waiting to raise these claims for the first time in his reply brief to which the United States does not have an opportunity to respond.[4]   This Court will therefore evaluate Plaintiff's claim only as to counsel's failure to call Dr. Bogacki and Jevon Lewis, and alleged deficiency in choosing to call Ruben Lozada.

Petitioner challenges counsel's decision as to which witnesses to call at trial.   Where a petitioner challenges his counsel's decision as to which witnesses to call, courts "are 'required not simply to give [the] attorney[] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as he did.'"   *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014).   "*Strickland* requires that a defendant 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'   466 U.S. at 689 (internal quotation marks omitted).   If the Government 'can show that counsel actually pursued an *informed* strategy (one decided upon after a thorough investigation of the relevant law and facts),' the effectiveness of counsel's assistance is 'virtually unchallengeable.'   *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005)."   *United States v. Graves*, --- F. App'x ---, ---, 2015 WL 3406548, at *2 (3d Cir. May 28, 2015).

---

[4]  This Court notes, however, that Shanel Nelson would purportedly only testified that Redd approached her after the shooting of Fussell.   (ECF No. 25).   Trelana Redd in turn avers that she would have testified to seeing Petitioner on the night of the shooting and saw him run off after hearing shots fired.   (*Id.*).   Redd's purported testimony, however, does not appear to match the statement Petitioner gave to police as she makes no mention of the vehicle from which Petitioner told police someone fired upon him.   (*Id.*).   Thus, the Court notes that even were it to consider Petitioner's untimely allegations as to these witnesses, they would be of dubious merit at best.

13

Petitioner first challenges counsel's refusal to call Dr. Bogacki to the stand.   Petitioner argues that Bogacki could have provided Petitioner's version of the events which occurred on the night of the Fussell murder and could have given explanations for Petitioner's behavior. Petitioner fails to provide an affidavit or other supporting documentation in support of his claims that Bogacki would have so testified.   Preliminarily, this Court notes that Petitioner's failure to provide a sworn statement as to the testimony Bogacki, and, for that matter, Jevon Lewis, purportedly would have given at trial prevents Petitioner from being able to show that he suffered any prejudice by counsel's failure to call them as witnesses.   *See, e.g., Tolentino v. United States*, Civil Action No. 13-4168, 2014 WL 3844807, at *3 (D.N.J. July 31, 2014) ("[a petitioner's] failure to include a sworn statement regarding the nature of [a witness's] proposed testimony is fatal to his making a *prima facie* showing of prejudice"); *see also Duncan v. Morton*, 256 F.3d 189, 201-02 (3d Cir. 2001).

Putting aside the fact that the failure to provide such a sworn statement prevents Petitioner from being able to show any prejudice as a result of counsel's failure to call Bogacki or Lewis, the record before this Court clearly establishes that the choice not to call Bogacki was based on sound trial strategy.   As the memorandum submitted by Petitioner's former counsel clearly shows (*see* Document 1 attached to ECF No. 18), counsel interviewed Dr. Bogacki in advance of making a decision whether to call him.   Counsel found that the statements that Petitioner made to Bogacki contradicted credible statements made by Sergeant Strang during his testimony, and that counsel had used the cross examination of Strang to show that Petitioner's failure to give himself up to police would have been a natural and non-suspect action under the circumstances.   (*Id.* at 1). Thus, Bogacki's testimony as to Petitioner's version of events would have run counter to counsel's

14

assertion during the Strang cross that Petitioner acted naturally when confronted by police the night of the shooting and Petitioner's behavior did not suggest guilt.  (*Id.*).  Counsel also notes in his memo that Bogacki's recollection of Petitioner's claims included information that ran directly afoul of the physical evidence recovered when Petitioner was arrested.  (*Id.*).  Counsel therefore felt that Bogacki's testimony would have either confused the jury or would have outright harmed the credibility of Petitioner's statements to police that he had not shot Fussell.  (*Id.* at 1-2).  Counsel also noted that Bogacki would be subject to cross examination which could result in the revelation of Petitioner's previous conviction for manslaughter.  (*Id.* at 2).  Based on the information collected from Bogacki, counsel therefore felt that calling the doctor would hurt, rather than aid Petitioner's case, and made an informed and strategic decision not to call Bogacki.  (*Id.* at 2-3).  Indeed, counsel's memo indicates that both Dr. Bogacki and Petitioner himself came to the same conclusion.  (*Id.* at 3-4).  As counsel's decision was informed and based on sound trial strategy (reducing contradiction and not hurting Petitioner's defense), this Court concludes that his decision not to call Bogacki was not deficient.  *Graves*, --- F. App'x at ---, 2015 WL 3406548, at *2.

As to Jevon Lewis, Petitioner has also failed to provide any sworn statement as to what testimony Lewis would have given.  Indeed, as Lewis was a co-defendant in Petitioner's case, counsel could not have compelled Lewis to testify even had counsel desired to do so.  Another flaw in Petitioner's argument as to Lewis is that Lewis, during a proffer session with the Government following his conviction admitted his role in the conspiracy at issue.  As Petitioner himself states, Lewis admitted that

> Morales agreed to pay Lewis $10,000 to [kill Fussell].
> Lewis further stated that he subcontracted the murder out to Jamar

> Bacon.  He said he chose Bacon because he knew Bacon was
> aggressive and therefore likely to agree to kill Fussell.  Lewis said
> that he could not remember if [Petitioner] was present when Lewis
> offered the murder contract to Bacon, but Lewis acknowledge that
> Bacon and [Petitioner] were always together and did everything
> together.  Lewis stated that he dealt with Bacon and not [Petitioner]
> regarding the murder, and that after the murder, Bacon told Lewis
> that both Bacon and [Petitioner] committed the murder[.]

(Petitioner's reply brief, ECF No. 23 at 7).  Petitioner has therefore essentially admitted that

Lewis's testimony could only have harmed him.  While Petitioner seems to believe that these

purported statements would indicate his innocence, they would clearly have harmed Petitioner had

they been made at trial, and counsel would therefore have acted correctly in deciding not to call

Lewis.  In any event, as Petitioner has failed to provide any sworn testimony as to what Lewis

would have testified, he cannot demonstrate prejudice and therefore cannot show that counsel was

ineffective for failing to call Lewis.  *Duncan*, 256 F.3d at 201-02; *Tolentino*, 2014 WL 3844807

at *3.

Petitioner's final claim as to counsel's alleged deficiency in choosing which witnesses to

call is his assertion that counsel was ineffective in that he chose to call Ruben Lozada as a defense

witness.  Petitioner bases this assertion on his argument that Lozada was not a credible witness

and thus suffered on cross examination, something he alleges counsel would have realized had he

spoken with Lozada for more than a few minutes.  As to Petitioner's assertion that counsel met

only briefly with Lozada, records provided by counsel show that he and co-counsel met and spoke

with Lozada for half an hour before choosing to call him to the stand.  (Document 2 attached to

ECF No. 18).  Petitioner's assertion that counsel did not take more than a few minutes to speak

with Lozada before calling him appears to be meritless.

More importantly, the decision to call Lozada was a perfectly sound strategic choice.

16

Although Lozada's credibility may have been questionable, counsel chose to call him based at least in part on a *Brady* disclosure provided by the government indicating that Lozada had told the Government that Raymond Morales had told Lozada that Morales had killed Fussell himself.   (*See* Document 6 attached to ECF No. 15).   Lozada testified that to this same information at trial.   (*See* Document 3 attached to ECF No. 15 at 3-5).   Although Lozada's credibility was challenged on cross examination, no information elicited from Lozada in any way harmed Petitioner or would suggest that Petitioner was responsible for the Fussell murder.   Thus, Lozada's testimony provided counsel with a means to suggest an alternative killer for Fussell without any risk of inculpating Petitioner.   As such, it was sound trial strategy to call him, regardless of the attacks his credibility would suffer on cross examination.   Counsel made an informed, strategic choice to call Lozada after a half hour interview and review of the Government's *Brady* disclosure, and that choice resulted in no negative information regarding Petitioner coming to light.   As such, Petitioner has failed to show that counsel was deficient in calling Lozada, and Petitioner has therefore failed to show that counsel was ineffective.   *Graves*, --- F. App'x at ---, 2015 WL 3406548, at *2.

**c.   Petitioner's argument that counsel was ineffective for failing to move to dismiss count three of the indictment as time barred**

Petitioner also argues that counsel was ineffective for failing to move to dismiss count three of the indictment as time barred as the superseding indictment in which Petitioner was first charged with murder with a firearm in the course of a drug trafficking offense was returned more than five years after the events in question occurred.   Movant bases his argument on the assertion that 18

17

U.S.C. § 924(c) is subject to a five year statute of limitations, and his assertion that §924(j) is merely a sentencing enhancement that cannot increase the statute of limitations.   Petitioner is incorrect.

Petitioner bases his argument on 18 U.S.C. § 3282(a).   That statute provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, **not capital**, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."   18 U.S.C. § 3282(a) (emphasis added). The statute's clear language states that it does not apply in capital cases, i.e. those where the potential maximum sentence is death.   Offenses punishable by death are instead subject to 18 U.S.C. § 3281, which provides that an "indictment for any offense punishable by death may be found at any time without limitation."   18 U.S.C. § 924(j) clearly states that, where a person violates § 924(c) by committing a murder, the Petitioner "shall . . . be punished by death or by imprisonment for any term of years or for life."   By the statute's plain language, a violation of § 924(j) is punishable by death, and as such there is no statute of limitations applicable to count three of Petitioner's superseding indictment.   *Accord United States v. Korey*, 614 F. Supp. 2d 573, 582 (W.D. Pa. 2009) (even where death penalty is not applicable to a given defendant due to his minor status, a violation of 18 U.S.C. § 924(j) is not subject to any statute of limitations as it is still "punishable by death").   Petitioner's assertion that count three was subject to a five year statute of limitations is therefore clearly without merit and any objection on that basis by counsel would have been denied.   As such, counsel was not deficient for failing to make such an objection and Petitioner has therefore failed to show counsel was ineffective on this ground.   *See United States v. Aldea*, 450 F. App'x 151, 152 (3d Cir. 2011) ("[c]ounsel cannot be ineffective for failing to raise

meritless claims"); *United States v. Berry*, 314 F. App'x 486, 489 (3d Cir. 2008); *Wets v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000); *Parrish v. Fulcomer*, 150 F.3d 326, 328-29 (3d Cir. 1998).

**d.   Petitioner's argument that counsel was ineffective for failing to object to the indictment's failure to allege the elements of aiding and abetting**

Petitioner next argues that counsel was deficient for failing to object to the indictment as the indictment did not contain language properly alleging aiding and abetting liability. Petitioner's argument is utterly without merit.   First, this Court notes that the indictment contained statutory references to the aiding and abetting statute, 18 U.S.C. § 2, in relation to counts two, three, and four, and Petitioner's assertion is thus entirely incorrect.   (*See* Superseding Indictment, Criminal Action No. 06-76 at ECF No. 99 at 13, 15, 16).   Even were Petitioner's assertion that there was no reference to the aiding and abetting statute accurate, however, Petitioner's argument would still fail.   As the Third Circuit has explained, "every 'indictment must be read as if 18 U.S.C. §2 were embodied in each count.'"   *United States v. Wasserson*, 418 F.3d 225, 232 (3d Cir. 2005) (quoting *United States v. Forsythe*, 560 F.2d 1127, 1136 n. 15 (3d Cir. 1977)). "Accordingly, the indictment need not specifically charge aiding and abetting in order to support a conviction for aiding and abetting."   *Id.*   An objection to the indictment for failure to allege aiding and abetting would therefore have been denied as meritless and counsel was thus not deficient for failing to make such a motion.   *Aldea*, 450 F. App'x at 152; *Wets*, 228 F.3d at 203; *Parrish*, 150 F.3d at 328-29.

**e.   Petitioner's argument that counsel was ineffective for failing to challenge the**

government's "vouching" for witnesses during summation

Petitioner next contends that counsel was ineffective for failing to object to the Government's "vouching" for the credibility of various witnesses during summation.  As the Third Circuit has explained:

> [v]ouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury.   A prosecutor's vouching for the credibility of a government witness raises two concerns: (1) such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and (2) the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.
>
> . . . .
>
> Our case law indicates that to find vouching two criteria must be met: (1) the prosecutor must assure the jury that the testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge or other information not contained in the record.   Thus, it is not enough for a defendant on appeal to assert that the prosecutor assured the jury that a witness' testimony was credible.   The defendant must be able to identify as the basis for that comment an explicit or implicit reference to either the personal knowledge of the prosecuting attorney or information not contained in the record.   It follows that where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching.   Likewise, prosecutorial comment that points to a lack of evidence in the record which supports a defendant's argument that the witness is not credible is proper so long as the comment does not constitute an assurance by the prosecutor that the witness is credible.

*United States v. Walker*, 155 F.3d 180, 184, 187 (3d Cir. 1998); *see also United States v. Lore*,

430 F.3d 190, 211-12 (3d Cir. 2005).

Here, Petitioner challenges the following exchanges from the Government's summation:

> But please consider each witness separately. Do not let the defense attorneys lump them all together. Every witness is different. You scrutinize every witness; I saw you doing this, I saw you looking at the witnesses.

> And now we move to a closely related topic. Let's ask whether any of the testimony of – at this trial was enhanced. What do I mean by enhanced testimony[?]

> Well, once again the defense would have you believe that the cooperating witnesses were desperate to get the benefit of their plea agreements.

> So, wouldn't you expect such witnesses[,] if they decided to lie on the witness stand[,] to make their testimony better so that the chances for conviction of these defendants would improve? Many cooperating witnesses had ample opportunities if they wanted to improve the impact of their testimony.

> Let's take a critical example from this case. Jermaine Coleman and the Ahmed Judge confession; Jermaine Coleman testified that at one point during his conversation with [Petitioner], he asked [Petitioner] essentially were you actually the guy who shot . . . the victim.

> Jermaine Coleman could have said yeah, [Petitioner] told me yes. Instead Jermaine stood up to you and he showed you what [Petitioner] did (indicating), but he said that [Petitioner] did not give a verbal response.

> You know that Jermaine talked to [Petitioner] for a while before Trevor Smith joined that conversation, so all Jermaine Coleman had to say was [Petitioner] told me he did it before Trevor Smith joined in. It's a freebee, there is nobody there to contradict you.

> And then Jermaine would have had no fear that Trev would contradict him. This was an easy opportunity for Jermaine to improve the evidence against [Petitioner], yet he did not do so.

What does that tell you about whether he was lying during his testimony[?]   Such a simple way to enhance his testimony, yet he chose not to do so.   Yet supposedly facing so much time in prison, Jermaine Coleman would do anything to help the Government and thereby himself.

How many times during this trial did [the Government] ask a witness a question, and an affirmative answer would have provided additional evidence, and the answer was no, or I do not know.   Or on occasion we said something wrong or inaccurate and the witness corrected us.

So we ask you to consider whether the refusal of the Government's witnesses to enhance their testimony is relevant to the credibility of those witnesses.

. . . .

What was Donte Pettit's motive to lie? Did he receive or will he receive a benefit from the Government?   He testified that the only reason he was here in this courtroom was because [he] had been subpoenaed to testify.   Do you think he knew why Jevon Lewis came to him and asked him to bail out [Petitioner]?

. . . .

. . . Karah Moore said that he saw Ray Morales and Jevon Lewis together just once.   Karah Moore could easily have enhanced and said, A, he saw them together a number of times; and B, that Lewis told him that he was buying from Ray, or vice versa that Ray was selling to Lewis.

But Karah Moore did not do so.   Why?   Because the Government submits that he told you the truth.

. . . .

Karah Moore also testified that in 2001 he saw Lewis and [Petitioner] and Jaymar together quite a few times.   He told you that on a couple of those occasions he saw Jaymar and [Petitioner] exit Lewis' car, and they would look around and they would act like they were protecting someone with their hands inside their shirts as if they were carrying a gun.

He didn't see a gun; why not enhance[ his testimony?]

. . . .

[discussing the interview of Petitioner by Kevin Kellejan] Another example of something strange [said by Petitioner in the interview], [Petitioner] was running and his clothing [including a hooded sweatshirt, hat, and dog tags] "just came off."   It just came off?   Ask yourselves[,] is it so suprising that Kevin Kellejan remembered that specific answer[?]   And is it surprising that when he heard it he wrote it down in quotes in his report?

. . . .

By the way, if Sergeant Strang really wanted to strengthen the case against [Petitioner], if he really wanted to help convict [Petitioner], why doesn't he simply say "oh yeah, [Petitioner] told me he did it."   Why not enhance?   Same thing is true for Kevin Kellejan, who interviewed him for hours.   So what does that tell you about their credibility as witnesses[?]

. . . .

Murray would also testify that he would see Jaymar at Lewis' drug set, that Jaymar would go to Cool V as he called Jevon Lewis, and Jaymar and Lewis would go off to the side; Murray would not hear what they were talking about, and Murray would leave the set.

Ask yourself, why didn't Murray enhance that testimony, tell you what they were talking; tell you what they talked about[?]   It's a freebee, one man's dead, the other guy's on trial.   Once again, the Government submits that Murray did not enhance his testimony because he is telling the truth.

. . . .

And I submit[,] ladies and gentlemen, if Ray Morales is that smart and all of these things [Defendants argue] are true, you believe all these things [Defendants claim], that maybe he did dupe the Government [into believing Petitioner and his codefendants were guilty], maybe we are just plain stupid.

. . . .

23

. . . and here is the problem . . . the defense has with Fillmore Davis' testimony; they know how much his testimony hurt [Petitioner].

But the problem is that if he has a motive to lie it's a motive to help [Petitioner] because he said he is my lifelong friend, of course I would do nothing to hurt him.   That puts the defense in a very difficult position [in attacking his credibility].

. . . .

And the reason it is much easier [for the defense] to attack Raymond Morales' credibility because he's a very bad person than it is to attack the MOB Boys' credibility.   Because try as they might[,] the defense attorneys could not show you that the MOB Boys were violent people.

They were relatively smart businessm[e]n who weren't too greedy and they ran a drug set, they didn't sell weight, they allied themselves with some bad people because they were smart.

. . . .

[A defense attorney] pointed out to you that Victor Rodriguez already received a benefit of his cooperation, he already got a huge break when he was sentenced before.

But has he had any opporunity to coordinate his testimony with Ray Morales?   And if not why – if they're both lying[,] why is so much of his testimony similar to Ray Morales' testimony?

And more significantly[,] has he enhanced his testimony against [counsel's] client?   Essentially what he told you was yeah, I saw Ray come up to him once and tell him I'm trying to get him on the team, and then – but he doesn't know anything about Mack Jones according to him [talking] about Ray selling him stuff.   It's so easy to enhance.

. . . I'll talk about this more later, but [counsel] talked about easy lies, here's an easy lie; Ray told me one day he sold to Mack Jones.

Very easy lie.   Victor Rodriguez didn't choose that path. Why not ask yourselves whether that affects your assumption of his

24

credibility.

. . . .

I want to finish with one thought and that is the following. I told you in the beginning of this case, I mean in the beginning of my closing, when I went through all of these issues about witness credibility, I raised an issue that I submit to you you never thought of before.

And that is this notion of enhancing your testimony and this notion if you're a cooperating witness and you want your sentence reduction to be as great as you can, that you will try to enhance your testimony.

And I asked you to consider if people, cooperating witnesses have not enhanced their testimony at certain junctures you should find great significance in that.

And then I listened to all of the defense closings, the hours of defense closings because I always listen to see whether defense attorneys have a persuasive response to that.

And it is the Government's position that the first two defense attorney's did not.   And the reason is it's almost impossible to form a persuasive response to that argument in my opinion.

But [one defense counsel] embraced it.   He talked about the notion of an easy lie, and he's right, when you can give an easy lie and you don't give it, then that is exactly my point.

And he's right, sometimes it's not an easy lie, you have to make up too many details and you can get caught in your details.

But I gave you example after example after example in my closing argument of points in the testimony of the cooperating witnesses where the easy lie was available, they did not take it.

I told you about Jermaine Coleman saying that [Petitioner] went like this (indicating), and you know what an easy lie was in that instance.

And as you sit and deliberate and you talk about what the witnesses said and what they didn't say.   Ask yourselves how easy

25

it would have been for them to give the easy lie.

And if they did not, does that belie the defense theory that these people would do anything to get their 5K letter to the judge at time of sentencing.

But if they would do anything, they should grasp, they should grab hold of the easy lie.   And if they do not, what does that tell you about credibility.   So never forget great caution and care. Never forget it.

We understand our burden.   It's one of our burdens.   We present witnesses, cooperating witnesses, you have to scrutinize the testimony.   I invite you to scrutinize the testimony.

(Excerpts of the Government's closing and rebuttal, Document 7 attached to ECF No. 15 at 1-20).

Having reviewed these statements which Petitioner challenges and the totality of the Government's closing and rebuttal, it is clear that the Government did not engage in improper vouching.   It is clear from the above excerpts that the Government made a fair argument regarding the credibility of its witnesses not based on its own opinion or evidence outside of the record, but rather based on what was testified to by each witness as opposed to what they could have said had they been possessed of a motive to fabricate information.   That these arguments were made in response or as a preface to defense counsel's arguments attacking the credibility of these witnesses makes these arguments entirely proper.   As the Government's statements in support of the witness's credibility were based neither on the Government's personal knowledge nor on information outside of the record of trial, these were fair comments and do not run afoul of the prohibition on vouching during summation.   *Lore*, 430 F.3d at 211-12, *Walker* 155 F.3d at 187. Indeed, the only reference to the Government's opinion in these excerpts Petitioner challenges was a statement by the Government as to the abstract rhetorical effectiveness of arguments as to why lack of enhancement does not support credibility, and was made without any accompanying

26

statement that any given witness was credible.   Likewise, the use of the phrase "the Government submits" in no way transforms the proper argument recounted above into improper vouching as it is no more than a statement that the prosecutor's statements represent the Government's arguments.   *Walker*, 155 F.3d at 188-89.   Petitioner has thus failed to show that the Government engaged in improper vouching.   As the Government did not engage in improper vouching, any motion to strike on that basis would have been denied, and counsel's failure to make such a motion does not constitute ineffective assistance of counsel.   *Aldea*, 450 F. App'x at 152; *Wets*, 228 F.3d at 203; *Parrish*, 150 F.3d at 328-29.

**f.   Petitioner's argument that counsel's errors cumulatively resulted in ineffective assistance**

Petitioner argues that, even if individually counsel's errors are not sufficient to establish ineffective assistance, those errors cumulatively violate his Sixth Amendment rights.   "[E]rrors that individually do not warrant habeas relief may do so when combined."   *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007); *see also Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2002). Cumulative error only warrants habeas relief, however, where a petitioner can show that he was actually prejudiced.   *Albrecht*, 485 F.3d at 139.   A petitioner seeking to make out a cumulative error claim must therefore show that the errors committed at trial together "had a substantial and injurious effect or influence in determining the jury's verdict."   *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008).   Essentially, Petitioner must demonstrate that the errors in combination would be sufficient to show *Strickland* prejudice.   *Albrecht*, 485 F.3d at 139.   As this Court has expressed above, Petitioner has failed to demonstrate that counsel was deficient, and certainly has not demonstrated that any of counsels alleged failures resulted in actual prejudice to his case.   In light

27

of the significant evidence presented at trial, Petitioner's assertions fair no better cumulatively.

Petitioner has failed to establish that counsel was deficient, and has likewise failed to show that he

suffered any prejudice as a result of any alleged errors.   As such, Petitioner has failed to

demonstrate that the alleged cumulative errors warrant habeas relief.

### g.   Petitioner's argument that counsel was ineffective for failing to make a speedy trial motion

Petitioner also argues that counsel was ineffective in that he failed to object to an alleged

violation of Petitioner's constitutional right to a speedy trial which occurred when he was held first

by the State and later by the Government prior to trial.[5]   A claim that a petitioner's constitutional

right to a speedy trial has been violated is evaluated under the four part test announced in *Barker*

*v. Wingo*, 407 U.S. 514 (1972).   *United States v. Claxton*, 766 F.3d 280, 293 (3d Cir. 2014);

United *States v. Battis*, 589 F.3d 673, 678 (3d Cir. 2009).   The four *Barker* factors are as follows:

"the length of the delay, reason for the delay, extent to which the defendant asserted his speedy

trial right, and the prejudice suffered by the defendant."   *Battis*, 589 F.3d at 678.   "None of these

---

[5] In his amended petition, Petitioner alleged only a constitutional violation of his speedy trial rights.   (ECF no. 8 at 23).   In his reply brief, Petitioner argues at length that his constitutional speedy trial rights were violated, but also states that, to the contrary of the Government's assertion in its response, he "does contend that his statutory right to a speedy trial was violated in this case."   (ECF No. 23 at 24).   Petitioner, however, does not argue how his statutory right to a speedy trial, which is applicable only to federal detention, was violated in this case.   As Petitioner does not make such an argument, he has provided no more than a vague and conclusory allegation that his statutory right to a speedy trial was violated, and this Court need not address that argument.   *See, e.g., United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000) ("vague and conclusory allegations in a § 2255 petition may be disposed of without further investigation by the District Court").   As the statutory speedy trial argument was raised for the first time in Petitioner's reply brief, this Court need not consider it for that reason as well. *Thompson*, 2015 WL 1344793 at *6 n. 9.

factors is 'either a necessary or sufficient condition,' and the factors 'must be considered together with such other circumstances as may be relevant.'"   *Id.* (quoting *Barker*, 407 U.S. at 533).   In evaluating the factors, the court must first examine the length of delay.   *Id.*   Where the delay is relatively brief, no consideration should be given to the other factors, but where the delay is sufficiently long, the court should review the remaining factors.   *Id.*   A delay of fourteen months is generally sufficiently long to warrant further consideration.   *Id.*   "When an arrest on state charges is followed by a federal indictment, the right to a speedy trial in the federal case is triggered by the [federal] indictment, and the time period under consideration commences on that date."   *Id.* at 679.

Although Petitioner argues as to both his state and federal periods of detention, *Battis* makes clear that the period to be considered for his speedy trial claim would have begun when he was indicted on federal charges.   Petitioner's claim therefore only concerns the delay starting on February 1, 2006, when he was indicted, through January 7, 2008, the first day of Petitioner's trial. (Criminal Action No. 06-76, ECF No. 1, 193).   As the delay between the initial indictment and the beginning of trial is nearly two years, and certainly more than fourteen months, this Court must consider the remaining *Barker* factors.

The next factor this Court must consider is the reason for the delay between Petitioner's indictment and trial.   Delays attributable to the Government fall into one of three categories: intentional delay intended to hamper the defense which weighs heavily against the Government, more neutral delay including delay attributable to negligence and crowded court dockets which weighs less heavily against the Government, and justifiable delay by the Government, such as to procure a missing witness.   *Battis*, 589 F.3d at 679.   Delay caused by the defense in turn weighs

29

against the defendant. *Id.* at 679-80.  Although the burden to justify the delay is on the Government, the amount of delay caused by the defendant is subtracted from the period of delay caused by the Government. *Id.* at 680.  Delay caused by the defense includes delay caused by the petitioner, his counsel, his co-defendants, or their counsel. *Id.* at 680; *Claxton*, 766 F.3d a 294-96.

Petitioner's case involved the prosecution of a complex drug conspiracy case involving numerous defendants and significant amounts of discovery.  Petitioner's matter was therefore continued between February 15, 2006, a mere two weeks after the indictment and immediately following the arraignment of the final defendant, and April of 2007 pursuant to orders to continue requested by all parties, including Petitioner through his counsel.  (Criminal Action No. 06-76 at ECF No. 56, 68, 74, 79, 82).  Petitioner's trial was further delayed between April of 2007 and September 10, 2007 by various omnibus motions and motions to relieve counsel filed by Petitioner and his co-defendants.  (*See, e.g.,* Criminal Action No. 06-76 at ECF No. 92, 125, 127).  While the period between September 10 and October 9, 2007 can be attributed to the Government's motions in limine, and thus falls into the second category of Government delay, the period between October 9, 2010 and the onset of trial on January 7, 2008, can be fairly attributed to various requests for delay and motions filed by Petitioner and his co-defendants.  (*See* Criminal Action No. 06-76 at ECF No. 133, 143, 150, 177, 180, 183).  As such, it appears that only approximately a month and a half of the delay can be attributed to the Government, whereas several months of delay can be attributed to Petitioner and his co-defendants.  As such, when one subtracts delay attributable to Petitioner and the defense from that attributable to the Government, no delay remains to prejudice Petitioner's rights.  The reason for the delays of Petitioner's trial therefore

weigh against any claim that his speedy trial rights were violated.

As Defendant did not make a speedy trial claim during the pendency of his federal prosecution,[6] the third factor weighs against his claim. *Battis*, 589 F.3d at 680-81. As to the final factor, prejudice to Petitioner's defense, Petitioner has failed to show that he suffered any such prejudice. The only prejudice Petitioner has even attempted to argue resulted from the delay is his argument in his reply brief that "[a] principal eyewitness to the crime, Ms. Tralanna Redd, became difficult to persuade to come forward." (ECF No. 23 at 24). Even putting aside that this argument was raised in reply, Ms. Redd states in the affidavit Petitioner has provided that she attempted to come forward and contact Petitioner's counsel in 2007 during the pendency of Petitioner's case in an attempt to testify on his behalf. (ECF No. 25). Thus, even if the Court did consider Petitioner's eleventh hour argument, it serves as its own refutation. If Redd sought to testify during the pendency of the federal prosecution as averred in her affidavit, then the Government's alleged delay appears not to have prejudiced Petitioner as Petitioner argues. As Petitioner has not presented any further argument for prejudice, and this Court perceives no other basis for such an argument, Petitioner has failed to demonstrate that any delay on the Government's part prejudiced his defense. The *Barker* factors therefore would not have supported any motion made by counsel asserting Petitioner's speedy trial rights, and any such motion would therefore have been denied. *Claxton*, 766 F.3d a 293-97. As such, counsel's failure to make such a motion was therefore not deficient, and provides no basis for a finding of ineffective assistance. *Aldea*,

---

[6] Petitioner claims that he made several speedy trial claims before the state courts prior to the onset of his criminal trial. As those motions, assuming *arguendo* that Petitioner filed them predate the start of his federal speedy trial clock, they have no bearing on this claim. *Battis*, 589 F.3d at 679.

450 F. App'x at 152; *Wets*, 228 F.3d at 203; *Parrish*, 150 F.3d at 328-29.

### h.   Petitioner's argument that counsel was ineffective for failing to challenge the sufficiency of the evidence as to count two in post-trial motions

Finally, Petitioner argues that counsel was ineffective in that counsel failed to challenge the sufficiency of the evidence presented against him in regards of count two, murder in furtherance of a continuing criminal enterprise or drug trafficking conspiracy, through post-trial motions. The inherent flaw in Petitioner's argument, however, is that counsel did raise an argument as to the sufficiency of the evidence presented as to count two on appeal, and the Third Circuit rejected that claim on the merits:

> [Petitioner] contends he should be acquitted of three of his convictions – for conspiracy, murder in furtherance of a drug-trafficking conspiracy, and murder in the course of a firearms offense – for lack of sufficient evidence. . . .
>
> . . . .
>
> [Petitioner] argues the government did not prove his participation in a conspiracy to traffic drugs, nor his sharing a unity of purpose with any co-conspirator. The evidence, [Petitioner] claims, "at worst placed [him] in the company of drug dealers." We disagree. Several government witnesses testified about [Petitioner's] active participation in Jevon Lewis's cocaine distribution operations throughout 2001 and 2002. One witness, Bernard Murray, testified to regularly visiting Lewis's drug set at 8th and Central Streets, where he would see [Petitioner] onsite, armed with a gun. Three MOB Boys testified about conversations they had with [Petitioner] in 2001, during which he complained about the quality of Lewis's crack cocaine, asked for advice about running a drug operation, and strategized about opening a new drug set with Lewis at 10th and Van Hook Streets. Additionally, the government introduced records showing 135 phone calls between [Petitioner] and Lewis over a five week period in May and June of 2001. Taken as a whole, this evidence provided a sufficient basis upon which a

rational jury "could have found the essential elements" of Lewis's conspiring to traffic cocaine and cocaine base beyond a reasonable doubt.

Furthermore, there was sufficient evidence to convict for murder in furtherance of a drug-trafficking conspiracy.  The statute provides: "[A]ny person engaging in any offense punishable under section 841(b)(1)(A) of this title . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results shall be [subject to punishment]."   Accordingly, the elements of a murder charge under § 848 are: an "intentiona[l]" killing; by a defendant "engaging" in an act punishable under § 841(b)(1)(A) (e.g., drug-trafficking conspiracy); and a nexus between the killing and the § 841(b) offense.

Viewed in the light most favorable to the government, ample evidence demonstrated [Petitioner's] guilt on all three elements of murder in furtherance of a drug-trafficking conspiracy.  As for an "intentional killing," an eyewitness saw [Petitioner] fleeing from the shooting, Sergeant Strang found [Petitioner] hiding in a field thirty yards away from the murder weapon (subsequently recovered by two other officers), and two MOB Boys testified that [Petitioner] confessed to them he had killed Kenneth Fussell.   As for [Petitioner's] "engaging" in an act punishable under § 841(b)(1)(A), in his case, conspiracy to traffic drugs, several government witnesses described [Petitioner] as a regular "muscle" at Lewis's drug sets, and the government's phone records showed a pattern of correspondence between [Petitioner] and Lewis consistent with conspiracy to sell drugs.   As for a nexus between the killing and the drug-trafficking conspiracy, Raymond Morales testified in detail about arranging for Fussell's death as well as his retaliatory motive. There was also sufficient evidence with respect to murder in the course of a firearms offense.   [Petitioner's] arguments on this charge are derivative of those he makes for the conspiracy charge— contending that because the government failed to prove his participation in a drug-trafficking conspiracy, it also failed to prove his responsibility for murder in the course of firearm offense, undertaken to carry out the conspiracy.   Because we reject [Petitioner's] argument on the conspiracy charge, we reject this argument as well.

*Judge*, 447 F. App'x at 412-14 (internal citations and footnotes omitted).

33

As the Third Circuit made clear on direct appeal, the government presented more than sufficient evidence to convict Petitioner of murder in furtherance of a drug-trafficking conspiracy. Had counsel moved to dismiss count two of the indictment for insufficient evidence, such a motion most certainly would have failed.  Counsel was therefore not deficient for failing to move to dismiss count two on that basis, and Petitioner has therefore failed to show that counsel was ineffective in failing to make that motion.  *Aldea*, 450 F. App'x at 152; *Wets*, 228 F.3d at 203; *Parrish*, 150 F.3d at 328-29.

## III.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from the final order in a proceeding under § 2255 unless he has "made a substantial showing of the denial of a constitutional right."   "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).   As Petitioner's claims are clearly without merit, he has failed to make a substantial showing that he was denied a constitutional right, and jurists of reason could not conclude that his claims are adequate to deserve encouragement to proceed.   As such, no certificate of appealability shall issue.

## IV. CONCLUSION

For the reasons stated above, Petitioner's motion to file his reply *nunc pro tunc* and to exceed the page limit for such a reply is GRANTED, Petitioner's motion to vacate is DENIED,

and Petitioner is DENIED a certificate of appealability.   An appropriate order follows.


Dated: August 11, 2015


    s/ Joseph E. Irenas
Hon. Joseph E. Irenas,
Senior United States District Judge

35